The **EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES,** Defendant, Appellant,

v.

**UNITED STATES of America,** Plaintiff, Appellee.

No. 6143.

United States Court of Appeals First Circuit.
April 27, 1964.

Stuart A. McCarthy, New York City, with whom James P. Lynch, Jr., Boston, Mass., Thomas J. Craig, Jr., Charles W. Muller, New York City, and Nutter, Mc-

Clennen & Fish, Boston, Mass., were on brief, for appellant.

Stanton H. Zarrow, Attorney, Department of Justice, with whom John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson and Joseph Kovner, Attorneys, Department of Justice, W. Arthur Garrity, Jr., U. S. Atty., and Murray H. Falk, Asst. U. S. Atty., were on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

One Brody, a former resident of Massachusetts, having survived various personal difficulties with the government due to nonpayment of his income tax, cf. Brody v. United States, 1 Cir., 1957, 243 F.2d 378, cert. den. 354 U.S. 923, 77 S.Ct. 1384, 1 L.Ed.2d 1438, disappeared, possibly to Switzerland. He is presumably still alive. He left behind, in addition to this outstanding obligation, two policies of life insurance on his life issued by appellant Equitable Life Assurance Society, the proceeds or value of which the government now seeks to reach, asserting a tax lien thereon under section 6321 of the Internal Revenue Code of 1954.[1] The policies, so far as appears, are in the hands of Brody's attorney in Florida who, not having Brody's permission, has declined to give them up. Equitable received the statutory notice of the tax lien in January 1959 and due demand for surrender of all "monies and property" subject thereto in May 1960, but refused any payment, including the accumulated dividends, no separate point of which is made on this appeal, because the policies had not been physically surrendered. This action to obtain payment under 26 U.S.C. § 7403,[2] was instituted in October 1961 against Equitable and Brody in the district court for the district of Massachusetts. Equitable, a New York corporation with its home office in New York, is doing business in Massachusetts. It is not claimed that Brody was domiciled in that state, but his returns had been filed there, which may have suggested this selection. See 28 U.S.C. § 1396. Jurisdiction rests on 28 U.S.C. § 1340. Brody not being found within the state, and his address being unknown, service was made by publication in compliance with the terms of 28 U.S.C. § 1655, infra. No other person was named as a party, or, on the record, could have any interest in the policies.[3]

Policy No. 11,653,183 (hereinafter the '183 policy) was issued to Brody in April 1943 in the face amount of $30,000 on the 15-year endowment plan. This meant that the policy totally "matured," viz., became payable to the endowment beneficiary, in April 1958. It would also have become payable on the insured's death had that occurred prior to the en-

---

1. "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount * * * shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

2. Summarizing, subsection (a) "Filing," provides for an action in the district court "to enforce the lien of the United States under this title with respect to such tax or liability or to subject any property, of whatever nature, of the delinquent, or in which he has any right, title, or interest, to the payment of such tax or liability." Subsection (b) "Parties," provides that all persons "claiming any interest" in the property shall be made parties. Subsection (c) "Adjudica-

tion and Decree," provides for an adjudication of all matters involved, and permits a sale of the property by decree of court and distribution in accordance with the interests of the parties. Subsection (d) "Receivership," permits the court to appoint a receiver with power, inter alia, to enforce the lien.

3. There could be no new beneficiary, nor any assignment which could affect the company, because the policies required any such change to be made in writing and filed at the home office. Cases cited by the company which have disregarded such provisions as between competing claimants for equitable reasons have not required a company that paid without notice of conflicting claims to pay twice.

dowment maturity. The amount payable in either instance was the face amount, plus any accumulated dividends, less any outstanding indebtedness and interest thereon. If the policy matured as an endowment the payee was the insured, whereas in case of death it was a named beneficiary. The right to change the beneficiary was reserved, and in 1957 Brody designated the Internal Revenue Service as the (revocable) beneficiary. Prior to maturity the insured could, from among other policy rights, elect to surrender the policy, or to borrow against it up to the current "Loan and Surrender Value" pursuant to a table contained in the policy. This table recited the dollar amount of the cash surrender value for each policy year, and stated that the loan value was the same amount minus a prepaid interest deduction computed to the next anniversary date. The reason for the difference is that a loan leaves the policy in force, where as surrendering it terminates the insurance. While the policy did not expressly say so, it has been held that surrendering the policy for its surrender value implies a physical delivery. Kothe v. Phoenix Mut. Life Ins. Co., 1929, 269 Mass. 148, 168 N.E. 737. In connection with paying the matured amount the policy expressly provided for its "surrender." The policy was written on a single premium basis, which premium was paid when the policy was issued.

Policy No. 10,777,528 (hereinafter the '528 policy) in the face amount of $1,000, was originally written in a different form, but in 1956 Brody converted it to an endowment policy maturing January 21, 1962, prepaying all premi-

ums.[4] The general policy provisions and circumstances, including the naming of the government as beneficiary, were otherwise similar to the '183 policy.[5]

The foregoing facts appearing, the government moved for summary judgment. Equitable resisted on the ground that Brody was an indispensable party, ineffectively served by publication, and that in his absence it was not liable on the policies unless they were physically surrendered, from which it would follow that if it paid now it could be obligated to pay a second time. The court granted the government's motion and decreed that the liens were foreclosed. It ordered Equitable to pay the government the "cash value and proceeds * * * computed as of the day of payment," which, while perhaps not precise, served to designate amounts which the company admits it would have owed had Brody then surrendered the policies and demanded payment. It further decreed that upon such payment every obligation of Equitable with respect to the policies would be discharged as to all persons. In its accompanying opinion the court stated that Equitable's cases of United States v. Massachusetts Mut. Life Ins. Co., 1 Cir., 1942, 127 F.2d 880, hereinafter referred to simply as Mass. Mutual, and United States v. Penn. Mut. Life Ins. Co., 3 Cir., 1942, 130 F.2d 495, had been "discredited" by United States v. Bess, 1958, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed. 2d 1135. Equitable appeals.

Equitable's first contention is that under Mass. Mutual the surrender of the policies was an absolute requirement, or condition precedent, to any liability. Mass. Mutual involved an unma-

---

4. It is arguable that any unearned prepaid amounts should be treated differently, with respect to the lien, from the amounts governed by the loan and cash surrender provisions of the policy. See Pyle, Liability of Life Insurance and Annuities for Unpaid Income Taxes of Living Insureds, Annuitants, and Beneficiaries, 9 Tax L.Rev. 205, 325, 337–338 (1954). However, the parties have not discussed this point and we need not pursue it.

5. Apparently dividends on this policy were to be applied to provide additional paid-up endowment insurance. No explicit disposition or even any mention of such amounts, if any, appears in the record. We do not decide to what extent, if at all, the government's lien might effectively proscribe the application of dividends to this use. See, generally, Pyle, supra, at 334–335, 340–342.

tured policy, and we will defer discussing it until later.[6] The '183 policy had matured even before the government filed notice of lien, and was absolutely owing except for whatever effect was due the surrender requirement. Under these circumstances the special considerations which moved us in Mass. Mutual do not apply. The provisions for physical surrender of the policy in connection with obtaining the matured value is a mere housekeeping matter to permit the company to tidy up its affairs. As the district court pointed out, an insurance policy is not a negotiable instrument or specialty embodying the obligation. Cf. Rosenthal v. Maletz, 1948, 322 Mass. 586, 593, 78 N.E.2d 652, 1 A.L.R.2d 1022. If the government was otherwise entitled to reach the obligation in this action the company could no more avoid this result by providing for the physical turning over of the policy than could a savings bank by a rule requiring delivery of the bank book. United States v. Manufacturers Trust Co., 2 Cir., 1952, 198 F.2d 366; United States v. Bowery Sav. Bank, 2 Cir., 1961, 297 F.2d 380. This is not to voice disagreement with the principle that in matters of substance the government's lien cannot rise above the rights of the taxpayer. United States v. Winnett, 9 Cir., 1947, 165 F.2d 149.

■ Considering, accordingly, the matured obligation represented by the '183 policy as absolutely owing to the insured, the question is whether it can be reached in this proceeding. The government says there is no problem. It concedes that the basic statute, section 7403, supra, fn. 2, made Brody an indispensable party, Macatee, Inc. v. United States, 5 Cir., 1954, 214 F.2d 717; cf. Shields v. Bar-

row, 1854, 17 How. 130, 139, 15 L.Ed. 158; State of Washington v. United States, 9 Cir., 1936, 87 F.2d 421, 427–28; F.R.Civ.P. 19, but asserts that he was adequately brought in for the purposes of quasi in rem jurisdiction by substituted service complying with the terms of 28 U.S.C. § 1655. The presently pertinent portions of this statute are the following:

"In an action in a district court to enforce any lien upon or claim to, or to remove any incumbrance or lien or cloud upon the title to, real or personal property within the district, where any defendant cannot be served within the State, or does not voluntarily appear, the court may order the absent defendant to appear or plead by a day certain.

\* \* \* \* \*

"If an absent defendant does not appear or plead within the time allowed, the court may proceed as if the absent defendant had been served with process within the State, but any adjudication shall, as regards the absent defendant without appearance, affect only the property which is the subject of the action. \* \* \*"

\* \* \* \* \* \*

The omitted portions are material in connection with the '528 policy, and will appear infra. The function of this statute, insofar as here relevant, is to give absent nonresident parties claiming an interest in property over which the court seeks to exercise jurisdiction due notice and opportunity to be heard, a fundamental condition not to jurisdiction, but to its assertion. Cooper v. Reynolds, 1870, 10 Wall. 308, 19 L.Ed. 931; Gran-

---

6. The district court, and the parties, in speaking of the '528 policy treated it as unmatured, which it was at the date of the institution of suit. This was the correct approach, because unless the company's obligations constituted property within the district at that time there could be no basis for quasi in rem jurisdiction. Crichton v. Wingfield, 1922, 258 U.S. 66, 42 S.Ct. 229, 66 L.Ed. 467, see Pennington v. Fourth National Bank,

1917, 243 U.S. 269, 37 S.Ct. 282, 61 L.Ed. 713. By amendment to the complaint, if filed and allowed by the court under F.R.Civ.P. 15(d), (and further publication) the government could have proceeded on the basis that this policy, also, had become fully matured, but no such amendment was filed. The parties apparently wish to treat this as a test case "of concern to \* \* \* the entire insurance industry."

nis v. Ordean, 1914, 234 U.S. 385, 34 S.Ct. 779, 58 L.Ed. 1363; Pennington v. Fourth National Bank, supra, 243 U.S. at 272, 37 S.Ct. 282, 61 L.Ed. 713. Unless the statute is to be read as wholly inapplicable to liens upon intangibles its use here seems peculiarly appropriate. Such liens are clearly given by section 6321 of the 1954 Code, supra, and are enforceable under 26 U.S.C. § 7403, supra, and there is no other statute which could be invoked where the defendant is outside the jurisdiction.

 In the absence of any applicable constitutional limitations,[7] we must give the phrase "personal property" in section 1655 the broad meaning necessary to effectuate the scope of these other provisions.[8] It cannot be determinative that historically the principal use of this statute was in connection with liens upon tangible property. Cf. Crichton v. Wingfield, 1922, 258 U.S. 66, 42 S.Ct. 229, 66 L.Ed. 467; Omaha National Bank of Omaha, Neb. v. Federal Reserve Bank of Kansas City, 8 Cir., 1928, 26 F.2d 884, 887–89; United States v. Dallas National Bank, 5 Cir., 1945, 152 F.2d 582; see also Blume, Actions Quasi in Rem Under Section 1655, Title 28, U.S.C., 50 Mich.L.Rev. 1, 20–22 (1951). There are, of course, limits as to what constitutes intangible property, see, e. g., United States v. Long Island Drug Co., 2 Cir., 1940, 115 F.2d 983, but in our opinion any chose of sufficient vitality to support a lien cognizable under section 7403 must equally qualify as property under section 1655. United States v. Metropolitan Life Ins. Co., 4 Cir., 1958, 256 F.2d 17. While, admittedly, the property must be subject to the control of the court, Chase v. Wetzlar, 1912, 225 U.S. 79, 32 S.Ct. 659, 56 L.Ed. 990; compare Hanson v. Denckla, 1958, 357 U.S. 235, 246–250, 78 S.Ct. 1228, 2 L.Ed. 2d 1283, it can hardly be said that the statutory federal lien afforded the district court, upon obtaining in personam jurisdiction of the obligor, any less dominion and control over the property herein than that which was held sufficient to permit state courts to render the judgments examined in such cases as Chicago, R. I. & Pac. Ry. v. Sturm, 1899, 174 U.S. 710, 19 S.Ct. 797, 43 L.Ed. 1144, Harris v. Balk, 1905, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023, and Biggert v. Straub, 1906, 193 Mass. 77, 78 N.E. 770 (garnishment) or Pennington v. Fourth National Bank, supra, and Bragg v. Gaynor, 1893, 85 Wis. 468, 55 N.W. 919, 21 L.R.A. 161 (injunction). But compare Andrews, Situs of Intangibles in Suits Against Nonresident Claimants, 49 Yale L.J. 241, 248–253, 254–261 (1939) (conflicting claim cases).

 Special questions arise with respect to the '528 policy. In United States v. Massachusetts Mut. Life Ins. Co., (Mass. Mutual), supra, the defendant insurance company refused to recognize a notice of levy and distraint whereby the government sought to obtain the cash surrender value of an unmatured policy on the life of a defaulting taxpayer.[9] The government thereupon brought an action under section 3710(b) of the Internal Revenue Code of 1939 (now I.R.C. (1954) § 6332(b)) for a "penalty" measured by the value of the "property, or rights to property, subject to distraint * * *" wrongfully withheld. The defense was that the policy had not been

7. There are none. Cf. Chicago, R. I. & Pac. Ry. v. Sturm, 1899, 174 U.S. 710, 19 S.Ct. 797, 43 L.Ed. 1144; Harris v. Balk, 1905, 198 U.S. 215, 25 S.Ct. 625, 49 L. Ed. 1023; Biggert v. Straub, 1906, 193 Mass. 77, 78 N.E. 770. Compare Hanson v. Denckla, 1957, 357 U.S. 235, 246–250, 78 S.Ct. 1228, 2 L.Ed.2d 1283.

8. There is a suggestion in Equitable's brief that there are further obstacles in that it "is not organized under the laws of Massachusetts nor is its principal office here." We could not accept the proposition that a debt or other incorporeal obligation on which the obligor can be sued elsewhere can be restricted for the purposes of section 1655 to the obligor's domicile. See fn. 7, supra; cf. United States v. First National City Bank, 2 Cir., 1963, 321 F.2d 14.

9. See I.R.C. (1939) §§ 3670–72, 3690, 3692, 3710(a), now I.R.C. (1954) §§ 6321–23, 6331(a), (b), 6334(c), 6332(a).

surrendered by the insured. We held for the company. In an opinion carefully analyzing the mutual rights and obligations of the parties under a policy of life insurance we stated, 127 F.2d at 883, that since "the insured has made no application for the cash surrender value and has not surrendered the policy. * * * the insurance company does not now owe the insured the cash surrender value." Or, as the court said in United States v. Manufacturers Trust Co., supra, 198 F.2d at 368, "the insurance company did not owe [the surrender value] * * * to the insured unless, and until, the insured elected to receive it by relinquishing his other rights under the policy." This was not to say that the government did not have a lien against the contract. The reverse was there assumed. But where a contract calls for alternative performances, at the obligee's choice, until the obligee chooses the obligor owes neither. See 1 Williston, Contracts, § 44 at 148 n. 15 (3d ed. Jaeger 1957); 5 Corbin, Contracts, § 1079 at 383–384 (1951); Restatement, Contracts, § 325 (comment a) (1932). In fact a selection of the cash surrender value is more than an ordinary election between two alternative rights. The insurance obligation was already operative. The company would remain liable for that obligation unless some positive action, binding on the insured, could affirmatively terminate it and substitute the alternative promise which, at least until the contract has finally matured, is clearly "inconsistent."[10] (United States v. Behrens, 2 Cir., 1956, 230 F.2d 504, 506, cert. den. 351 U.S. 919, 76 S.Ct. 709, 100 L.Ed. 1451). Consequently, as the court correctly pointed out in United States v. Penn. Mut. Life Ins. Co., 3 Cir., 1942, 130 F.2d 495, the payment of a "penalty" by the company to the government on the theory that this selection had been accomplished by the levy must leave the company still subject to the primary obligation unless one were to say, which, correctly, the court could not, that the ex parte levy could bind the insured, the one who "possessed" (United States v. Bess, 357 U.S. 51, 56, 78 S.Ct. 1054, 2 L.Ed.2d 1135, infra) the right to elect it. This was not a taking of money in the bank.

In other words, what we held in Mass. Mutual was that the government, by merely filing a notice of lien, or by an ex parte attempt to obtain the surrender value by levy, could not exercise the insured's election for him and make the company's obligation to pay mature as a debt in "possession."[11] Not presently

10. The amount of real insurance at any moment during the life of the policy is the difference between the cash surrender value and the face amount. An election to take the cash value prior to maturity is a discharge of the insurance feature of the contract. We cannot agree with the oft-quoted statement in In re McKinney, D.C.S.D.N.Y., 1883, 15 F. 535, 537, that the surrender value "constitutes * * * [an] advance to make up the deficiency in later premiums * * * the 'net reserve' required by law to be kept by the company for the benefit of the assured * * *." Actually the surrender value is less than the reserve which must be maintained against the policy. See Maclean, Life Insurance 181 (8 ed. 1957). Moreover, it represents matters in addition to an advance for payment for future premiums, or it would ultimately decrease as the policy approaches maturity. The fact is, as is illustrated by the within policies and, as we might judicially notice, ordinary life and endowment policies generally, it continuously increases. Returning to the matter of "inconsistency," it seems clear that upon death the inconsistency between the cash value and the insurance feature of the contract disappears. The company then owes the beneficiary the cash value plus the amount of the true insurance. Consequently, if we may be permitted to say so, as a matter of analysis we would wholly agree with the court in United States v. Bess, 1958, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135, infra, that the property of the insured which passes to the beneficiary on death is the surrender value.

11. Section 3710 of the 1939 Code then under consideration read "in possession of property * * *" whereas present section 6332 reads "in possession of (or obligated with respect to) property * * *." This does not change the concept of a present obligation.

owing the surrender value, it was not "in possession of property * * * subject to distraint" in the sense that it could incur the section 3710(b) penalty for failure to respond.[12]

There were sound practical reasons for this. The surrender value of a life insurance policy is related to the normal life expectancy of the insured, usually as of the date the policy was purchased. It constitutes the minimum worth of the policy. As we pointed out in Mass. Mutual an insured may be in various degrees of health and have but a short expectancy, making the actual value of his policy much greater. For poor health, or other reasons, he may be not reinsurable at any cost. The government failed in that case precisely for the reason that it could be permitted neither to exercise the insured's election to surrender the policy[13] and cut off other rights in a procedure which did not afford him and other interested parties the opportunity to protect their interests in the manner provided herein under section 7403 and by section 1655, nor to expose the insurance company to multiple liability, United States v. Penn. Mut. Life Ins. Co., supra.

Nor does United States v. Bess, 1958, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135, dictate a contrary result. In Bess a delinquent taxpayer died leaving policies of life insurance payable to his widow as beneficiary. Prior to his death the government had filed a notice of lien with the insurance company, but had taken no other action. The total cash surrender values immediately prior to death were relatively small, considerably less than the tax indebtedness, whereas the net proceeds payable to the beneficiary at death were substantially larger. The government attempted to collect the entire tax from the widow. The court held that pursuant to section 3670 (now I.R.C. (1954) § 6321) the government had a lien upon "all property and rights to property" of the insured, but restricted the government's recovery to the amount of the surrender values as of the time of death. While it is true that the court stated, 357 U.S. at 59, 78 S.Ct. at 1059, 2 L.Ed.2d 1135, that the "surplus of the paid premiums accumulated to make up the cash surrender value[14] should be treated for some purposes as though in fact a 'fund' held by the insurer * * *" this was very carefully not saying it was a fund. It was not a holding that the surrender value was an open debt, and particularly it was not a holding that this value became payable to the government upon its demand.[15]

**12.** It would unnecessarily prolong this opinion to consider to what extent the governemnt could subject rights in insurance policies to distraint and sale. As the court said in United States v. Stock Yards Bank, 6 Cir., 1956, 231 F.2d 628, at 631, distraint is a "blunt instrument" of sometimes doubtful propriety. For reasons at least indirectly indicated infra, its use in this field may be questionable. For present purposes we point out that if there is a levy and sale, as distinguished from the even blunter assertion of a penalty attempted in Mass. Mutual, the owner of the policy must be given notice. 26 U.S.C. § 6335(b).

**13.** It is important to note that we were there, and are here, talking in terms of contractual rights, and surrendering the policy in a contractual sense as distinguished from mere physical delivery. If Brody's Florida attorney, for example, had complaisantly turned over these policies without authority it would in our

view have affected the present case in no particular. Equitable, and companies in other cases, do themselves a disservice, in the sense of beclouding the issues, when they talk in terms of physical surrender.

**14.** With the greatest deference, a not strictly accurate characterization. See fn. 10, supra. The surrender value also represents what might be termed a savings factor.

**15.** In Bess the policy had matured. Moreover, all parties were before the court. Our decision conflicts with neither the holding, the language, nor the reasoning. The district court's view, on the other hand, that Mass. Mutual, which was nowhere mentioned, was discredited by Bess leads to peculiar difficulties. In United States v. Salerno, D.C.D.Nev., 1963, 222 F.Supp. 664, the court, relying on the opinion below, held that the government's notice of levy and demand upon

Although the district court's opinion that the Mass. Mutual line of decisions has been discredited was unwarranted, nonetheless Equitable's position is not advanced. In the present case the government does not seek to proceed summarily against the company, but has brought a plenary action joining the insured. Had there been personal service on the insured within the jurisdiction no one would question the court's right to reach the policy. United States v. Bess, supra, 357 U.S. at 57 n. 3, 78 S.Ct. 1054, 2 L.Ed.2d 1135; United States v. Fried, 2 Cir., 1962, 309 F.2d 851. Since the unmatured contract was sufficient to support a lien the government may equally proceed under section 1655. The insured is afforded the opportunity to protect his interests, and by the same token the company is protected against double liability. This right in the insured is far from a theoretical one. As we have pointed out, for example, because of an insured's poor health a policy may have a substantial worth beyond its cash surrender value. A sale of the policy may be more advantageous than its surrender. Or arranging for a policy loan in the government's behalf might be sufficient to meet the tax indebtedness.[16] That the court has scope in affording the insured relief see Schwarz v. United States, 4 Cir., 1951, 191 F.2d 618.

If the insured is served only by publication, as in the case at bar, there may be an additional problem not recognized by the court in United States v. Metropolitan Life Ins. Co., supra, and not adverted to by the parties here. We mention it, however, lest our decision be too broadly construed. Section 1655 provides that when any defendant cannot be served within the state, or does not voluntarily appear, an order to appear

"* * * shall be served on the absent defendant personally if practicable, wherever found. * * *. Where personal service is not practicable, the order shall be published as the court may direct, not less than once a week for six consecutive weeks.

\* \* \* \* \*

"Any defendant not so personally notified may, at any time within one year after final judgment, enter his appearance, and thereupon the court shall set aside the judgment and permit such defendant to plead on payment of such costs as the court deems just."

This means that an absent defendant who fails to appear and who was not personally served, even though the publication was made can as of right have the judgment vacated within the year.[17] Perez v. Fernandez, 1911, 220 U.S. 224, 31 S.Ct. 412, 55 L.Ed. 443.[18] The right

---

the insurance company for payment found the company with the surrender value in its "possession" to the extent that it became liable to account to the government, and assessed a penalty in the equivalent amount for not paying it over. At the same time the court held that the insurance contract continued in force. It so happened that the insured did not die, or the court might have had more forcefully impressed upon it the inconsistency of holding the company simultaneously on two alternative promises.

16. A policy "loan" is not, of course, a true loan as there is no obligation to repay. Board of Assessors of Parish of Orleans v. New York Life Ins. Co., 1910, 216 U.S. 517, 30 S.Ct. 385, 54 L.Ed. 597.

17. It is perhaps unnecessary to point out that the reopening protection thus afforded, on the theory that foreclosure of the lien would itself tend to result in actual notice, is particularly important where the property foreclosed is a chose in action and the suit may be brought, and the newspaper publication made, in a state where the absent defendant has no other connections. However, it is this very protection that, from the standpoint of due process, makes it fair to apply section 1655 as broadly as we do.

18. Perez v. Fernandez was decided under a statute which read "actually personally notified" rather than "personally notified." Act of March 3, 1875, c. 137, § 8, 18 Stat. 472. We have no reason to believe, however, that a substantive

to have the judgment set aside raises no problem where the intangible property on which the government has foreclosed was a simple debt. If the foreclosure was erroneously effected the defendant-claimant, on his learning of it within the year, will merely find that his interest has changed hands, but has not changed in character. If, however, his policy of life insurance has been surrendered, this is a most material change. If the policy cannot be ordered reinstated, a defendant may have suffered irretrievable injury. On the other hand, if the insurance company, an innocent third party, can be compelled to reinstate the contract, there is an obvious danger of "selection," to use an insurance term, against it. The most likely case where reinstatement will be requested, even, perhaps, by collusion between the other parties, will be where the insured-against loss has occurred. In other words, to foreclose a policy outright where there is an outstanding right to have the judgment vacated [19] leaves open an avenue of unfairness in one direction or another.

In these circumstances in the ordinary case where the insured or other parties having possible interests in the policy are not personally served and fail to appear, we might feel it inappropriate to foreclose on the contract to the extent of taking the surrender value directly and terminating the contract. Different considerations apply to enforcing the lien against the loan value. In such a case such maximum loan might be taken as would permit an arrangement under the flexible powers given to the court by section 7403, to continue the policy in

change was intended by the present codification.

19. We are not, of course, speaking about equitable relief under F.R.Civ.P. 60.

20. The government's lien had attached to the entire bundle of Brody's property rights in the contract, including his right to receive the endowment proceeds. It was this right, which had ripened and bore fruit at the time foreclosure was decreed, that the government collected upon. Cf. United States v. Bess, supra

force for the year available to reopen the judgment. Such questions, however, need not concern us here, for the '528 policy matured as a simple debt prior to the decree. The decree, appropriately, spoke as of the date of its entry.[20] For the government to be awarded all of the net proceeds would accordingly effect no damaging change of position nor prevent the restoration of the status quo if Brody should hereafter exercise his right to have the judgment set aside.

Judgment will be entered affirming the judgment of the District Court.[21]

(Government obtains surrender value at death, not value when lien attached); United States v. Dallas National Bank, 5 Cir., 1947, 164 F.2d 489.

21. After this opinion was settled we received copies of the Third Circuit opinions in United States v. Sullivan, 333 F.2d 100 and United States v. Wilson, 333 F. 2d 137. Examination thereof does not appear to call for any further elaboration on our part in the light of our essentially consistent result.