**UNITED STATES of America, Appellant,**

v.

**Louis H. MITCHELL et al., Appellees.**

**No. 20437.**

United States Court of Appeals Fifth Circuit.

July 26, 1965.

Michael I. Mulroney, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Joseph Kovner, Meyer Rothwacks, Attys., Dept. of Justice, Washington, D. C., Vernol R. Jansen, Jr., U. S. Atty., Mobile, Ala., for appellant.

Alex T. Howard, Jr., Robert F. Adams, Mayer W. Perloff, J. Edward Thornton,

Mobile, Ala., McCorvey, Turner, Johnstone, Adams & May, Thornton & McGowin, Mobile, Ala., of counsel, for appellees.

Before TUTTLE, Chief Judge, and MOORE * and BELL, Circuit Judges.

MOORE, Circuit Judge:

The United States of America (the Government) brought this action against Louis H. Mitchell and his wife, Betty K. Mitchell, (and other individual defendants) and against four insurance companies from whom Mitchell had secured life insurance, to collect income taxes assessed against Mitchell for the years 1943 through 1948 and 1951 through 1953, and against Louis H. and Betty K. Mitchell for 1954. In addition, the Government in this action sought to enforce tax liens "against funds in the possession or under the control of" the four insurance companies. The "funds", if any, exist only as a result of the contractual relationships between the insurance companies and Mitchell as expressed in the respective policies. The facts are more fully set forth in Judge Thomas's opinion below, 210 F.Supp. 810 (S.D.Ala.1962). At issue on this appeal is the question of whether the insurance companies were subjected to any liability to the Government as a result of the filing and serving upon them in September and October of 1949 of notices of levy, arising out of the Mitchell tax deficiency. These levies stated that "all property rights to property, moneys, credits and/or bank deposits" in the insurer's possession and belonging to Mitchell were seized and levied upon to pay his taxes. Payment of any amount owing to Mitchell was demanded.

To ascertain to what property rights the Government's levies might have attached, the contractual rights in the policies themselves must be examined. Four companies are involved: Travelers Insurance Co. (Travelers), John Hancock Mutual Life Insurance Co. (John Hancock), Prudential Insurance Co. (Prudential), and New England Mutual Insurance Co. (New England). In each policy, Mitchell's wife was the named beneficiary.

Using the Prudential policy as an example, it was provided in relevant part that:

> If this Policy be legally surrendered to the Company * * *, and if all premiums * * * have been paid in full, the Company will pay therefor the sum indicated in the following table, less any indebtedness to the Company on account of this Policy. The Company reserves the right to defer the payment * * for a period not exceeding ninety days after application for such Cash Surrender Value.

Like the others, it provided in addition that

> If this policy * * * shall lapse or become forfeited for the nonpayment of any premium * * * and if the Policy be not surrendered for its cash value, the Company upon the legal surrender of this Policy * * * will issue a non-participating Paid-up Life Policy * * * as specified in the following table * *.

Alternatively,

> If this Policy, having lapsed or become forfeited as specified in the clause, "Paid-up Life Policy," above, be not surrendered for its Cash Value or for a Paid-up Life Policy, the Company will put in force in lieu of this policy, without any action on the part of the Insured, a non-participating Paid-up Term Policy for the Face Amount of Insurance under this Policy, * * * to continue in force for the term indicated in the following table * * *. The Paid-up Term Policy will be delivered on the legal surrender of this policy.

Finally,

> If this Policy shall lapse, as above, and a Paid-up Life Policy be issued

* Of the Second Circuit, sitting by designation.

or a Paid-up Term Policy be put in force in lieu thereof, such * * * Policy may be surrendered at any time for its full reserve value at the time of such surrender. The Company reserves the right to defer the payment of any cash surrender value for a period not exceeding ninety days after application for such cash surrender value.

A table in the policy indicated for each of the first twenty years of the policy the values per $1,000 of face amount of cash surrender value, loan value, paid-up life policy, and the amount of automatic extended insurance. If the policy continued in force beyond twenty years, another table was available from the insurer. At the time of the notices of levy, the policies had the following cash surrender values: Travelers—$1,043.10; John Hancock—$428.10; Prudential—$170.52;[1] New England—$2,768.53.

The history of the policies subsequent to the entry of the tax judgment against Mitchell in 1951 discloses that at varying times thereafter, Mitchell defaulted on the premium payments. Pursuant to the policy provisions, extended term insurance was furnished as follows: Travelers—face amount of $13,630 from May 7, 1952 (cash surrender value then of $1,205.16) to May 17, 1959; John Hancock—from August 23, 1957 to June 26, 1962;[2] Prudential—face amount of $2,796.69 from September 25, 1955 (cash surrender value then of $282.94) to October 25, 1961. The New England policy provided for paid-up insurance at a reduced face amount in case of default. The defaults commenced on November 1, 1951, and the policy matured on February 1, 1959, with a maturity value of $4,859.97.

To the Government's claim that the insurance companies were liable for the cash surrender value of the policies at the time of the levy, they responded that the cash surrender value was not payable without written election by Mitchell and surrender of the policy.

The Government and the insurance companies stipulated the issues to be decided by the court:

1. Does the government have any right to enforce a levy against the policies in the absence of an election by the insured owner of the policy to take its cash surrender value, accompanied by a surrender of the policy, and in the absence of a court order requiring them (the insurance companies) to turn over this money to the government?

2. In the event the government has this right, at what date does the cash surrender value to which the government is entitled become effective, namely, the date of the levy, the date of the decree in this court, or some intervening date?

The trial court concluded that the Government had no such right and was entitled only to the amounts available under the policies at the time of the judgment —1963. At that time, all but the New England policy were entirely defunct; thus, the Government took nothing. As for New England, however, the Government was entitled to the maturity value of $4,850, which exceeded the 1949 cash surrender value of $2,768. Judgment was also entered against the Mitchells on all assessments. The Government appeals, asking that judgment be reversed against Travelers, John Hancock and Prudential "for the amount of the cash surrender value of each policy as of the date of the levy, plus statutory interest," and that the judgment against New England be modified to the same effect. All insurers but New England oppose the appeal.

■ This action began in the complaint as a lien case, and seems to have shifted in the stipulation to a levy case.

---

1. The cash value of the policy was $1,723.25 but had to be offset by an outstanding loan and interest totalling $1,553.23.

2. The record does not indicate the face value or the cash surrender value in 1957.

The first step, therefore, must be to place the statutory framework for both approaches firmly in mind. Section 3670 of the Internal Revenue Code of 1939 (now § 6321 of the Internal Revenue Code of 1954) [3] provides essentially that

> If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount * * * shall be a lien in favor of the United States upon all *property and rights to property*, whether real or personal, belonging to such person. (Emphasis added.)

The lien which thus arises upon assessment attaches to the taxpayer's property upon demand and refusal to pay, and under section 3678 (§ 7403), a civil action could be brought to enforce such a lien, whether or not distraint proceedings have been commenced.

■ The distraint proceedings referred to constitute a wholly independent collection procedure. Under it

> If any person liable to pay any taxes neglects or refuses to pay the same within ten days after notice and demand * * * it shall be lawful * * * to collect such taxes, by distraint and sale * * * of the goods, chattels, or effects, including stocks, securities, bank accounts, and evidences of debt, of the person delinquent as aforesaid. Section 3690 (see § 6331(a), (b))

> In case of neglect or refusal under section 3690, the collector may levy * * * upon all *property and rights to property*, except such as are exempt by the preceding section [§ 3691 (§ 6334)] belonging to such person, or on which the lien provided in section 3670 exists, for the payment of the sum due * * *. Section 3692 (see § 6331(a), (b)). (Emphasis added.)

When such distraint is to be made, notice shall be given to the owner or possessor of "the goods and effects distrained," and notice of sale shall be published forthwith; such sale must be within 10 to 20 days. Section 3693(a), (b), (c) (§ 6335). At such a sale, the Government may set a minimum price at which it may purchase the property if no bids are higher. Section 3695(a) (§ 6335(e)). However, "the goods, chattels, or effects so distrained shall be restored to the owner or possessor, if, prior to the sale, payment of the amount due is made * * *." Section 3696 (§ 6337(a) ). Finally,

> Any person in possession of *property, or rights to property*, subject to distraint, upon which a levy has been made, shall, upon demand by the collector * * * making such levy, surrender such *property or rights* to such collector * * *. Section 3710(a) (§ 6332(a)) (Emphasis added.)

And,

> Any person who fails or refuses to so surrender any of such *property or rights* shall be liable in his own person and estate to the United States in a sum equal to the value of the *property or rights* not so surrendered, but not exceeding the amount of the taxes * * * for the collection of which such levy has been made, together with costs and interest from the date of such levy. Section 3710(b) (§ 6332(b)) (Emphasis added.)

Thus the levy and distraint approach may be followed without regard to whether an action to enforce a lien has been brought. However, since levy presupposes a refusal to pay an assessed deficiency, in all levy cases a lien will already have arisen and attached, although it may subsequently have been released or the property subject to it discharged under sections 3673–3674 (§ 6325). See generally Plumb, Federal Tax Collection and Lien Problems, 13 Tax L.Rev. 247, 459 (1958). This is the procedural structure.

---

**3.** All references hereafter will be to Int. Rev.Code of 1939, followed by parenthetical references to the corresponding provisions of Int.Rev.Code of 1954.

The Government's argument has three steps. First, it claims that the cash surrender value of a life insurance policy "is a definite sum of money, readily calculable, which the insured can borrow against, sell, assign, or pledge." That the cash surrender value is readily calculable, no one disputes. But that is not the same as saying that the cash surrender value "is a fund in the hands of the insurer belonging to the insured." The difference stems from the nature of the entity referred to as the cash surrender value. Often, "in analyzing insurance tax cases, federal courts have evidenced a complete disregard for the realities of the insurance investment and have hinged their decisions on the form of the life insurance contract." Swihart, Federal Taxation of Life Insurance Wealth, 37 Ind.L.J. 167, 194 (1962). Here, however, it is the Government that is insufficiently mindful of the realities.

Most whole life level premium insurance policies provide, as do those here, that the insured can borrow against the cash surrender value,[4] or that in the event of non-payment of premiums the cash surrender value will be used for premium loans or for automatically extended term, or reduced face value paid-up, insurance. To the extent that loans are made, or extended insurance purchased, the insurer's obligation to pay the cash surrender value is diminished.

The cash surrender value cannot be considered a fund held by the insurer but belonging to the insured. Rather, it is an artificial measure of one of the many obligations—alternative and cumulative—of the insurer to the insured. The amount available at any one time to the insured, on surrender of the policy and election to take the cash surrender value, depends on the age of the policy, the amount of outstanding loans against the policy, and the amount used for extended insurance. Only fortuitously and perhaps never will the cash surrender value equal the investment component of the insured's premium payments.

Therefore, the exact uses to which the insurer is obliged to put the accumulating reserve depend upon the particular options being exercised and the point in the life of the policy and the insured. As a result of the insured's action or inaction, the insurer's obligation to pay the cash surrender value may be diminished by a number of means. The total obligation will be diminished only when the amount of other uses exceeds its incremental growth—by premium or by interest. If nothing is done by way of loan or default, however, the increment will always exceed the amount used to cover insurance costs.

4. In the typical whole-life level premium life insurance policy, the annual premium is used for three purposes: current insurance protection, costs and a profit to the insurer, and as the principal of an investment on which interest accrues until maturity. Prior to maturity, the total investment represents the capital so contributed plus interest, and the right to pass on at death the face value of the policy or, before death, to recover the cash surrender value of the policy. The proceeds at maturity represent the investment and interest and the pure insurance gain or loss. During the life of the policy, then, there is a "reserve" made up of the investment and interest. After payment of premiums terminates, the costs of insurance are covered from this reserve, which continues to accrue interest. Eventually, the reserve will equal the face value of the policy. Should the insured live even longer, the added incremental growth in the reserve would be gain to the insurer. See Vickrey, Agenda for Progressive Taxation, 407, 410–11 (1947). The "cash value" of the policy is an abstract amount somewhat less than the "reserve" as of the time of election to take the cash surrender value. See Rietz, The Nonforfeiture Provision, in The Life Insurance Policy Contract, 192, 193–198 (Krueger & Waggoner eds. 1953). We will use only two terms with reference to the cash surrender value. "Cash value" refers approximately to the accumulated reserve under the policy. "Cash surrender value" means the amount of the cash value available to the insured upon termination of the policy. If there is no policy indebtedness, the two will be equivalent. See United States v. Sullivan, 333 F.2d 100, 105 n. 12 (3d. Cir. 1964).

The Government argues that the Supreme Court's decision in United States v. Bess, 357 U.S. 51, 78 S.Ct. 1054, 2 L. Ed.2d 1135 (1958), "flatly holds that the federal tax lien attaches to the cash surrender value at the time the lien arises."

Both the lien and the levy approach require for their operation "property or rights to property" belonging to the taxpayer. The existence of property or rights to property is determined by reference to state law, since the Code "creates no property rights but merely attaches consequences, federally defined, to rights created under state law * * *." United States v. Bess, supra, 357 U.S. at 55, 78 S.Ct. at 1057; see Meyer v. United States, 375 U.S. 233, 236, 84 S.Ct. 318, 11 L.Ed.2d 293 (1963). See generally, Note, Property Subject to the Federal Tax Lien, 77 Harv.L.Rev. 1485 (1964).

All the parties apparently assume that Mitchell's property rights under this insurance policy are the same as those Mr. Bess had under his policy. We too will assume this to be so.[5]

Even so, there is some ambiguity as to exactly what property or property rights Bess had. The Court stated at one point that "Mr. Bess had 'property' or 'rights to property' within the meaning of § 3670, in the cash surrender value." 357 U.S. at 56, 78 S.Ct. at 1058. But the Court also referred to "the insured's property right *represented* by the cash surrender value * * *" Ibid. (Emphasis added.) Unfortunately, the posture of the case did not require close attention to the precise nature of the property rights in question, and required no attention at all to whether the *insurer* possessed "property" belonging to Bess.[6]

5. In doing so, we avoid a hornet's nest of open questions which, on the record before us, we are ill-equipped to decide properly. In Bess, the Court gave no indication why New Jersey law should govern whether Bess had property rights under the policy. Presumably, it was influenced by the fact that Bess died a resident of New Jersey, where the beneficiary, his widow, was still resident, and the Government had sued in the New Jersey Federal District Court. Nor has any enlightenment come from other decisions. See, e. g., Commissioner of Internal Revenue v. Stern, 357 U.S. 39, 78 S.Ct. 1047, 2 L.Ed.2d 1126 (1958); United States v. Brosnan, 363 U.S. 237, 80 S.Ct. 1108, 4 L.Ed.2d 1192 (1960); Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960); United States v. Durham Lumber Co., 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371 (1960); Meyer v. United States, 375 U.S. 233, 236, 84 S.Ct. 318, 11 L.Ed. 2d 293 (1963). Most likely the point has not yet been raised, perhaps because only the law of one state has ever had a substantial basis for being applicable. That is not so here. For example, Travelers home office is in Hartford, Conn., and the policy provides that the policy proceeds would be payable there. Mitchell was born in Alabama and lived in St. Louis, Mo., where he executed the policy. The same holds for the policy with Prudential, whose home office is Newark, N. J., where the proceeds are payable. The record does not indicate where Mitchell resided when he obtained policies from New England and John Hancock, whose home offices are in Boston, Mass. In 1949, when the liens arose and levy was made, Mitchell apparently was still in St. Louis, because the Missouri office of the Internal Revenue Service was handling the matter. Subsequently he moved to Birmingham, Ala. The main beneficiary, his wife, apparently resided with him at all times. We do not know where the other contingent beneficiaries resided nor where the other levies were made. The Government sued in the Southern District of Alabama. On these facts, then, we might consider at the very least the law of Missouri, Connecticut, New Jersey, Massachusetts, and Alabama. As a starting point in resolving this problem, one might see Hill, State Procedural Law in Federal Nondiversity Litigation, 69 Harv.L.Rev. 66, 90–91, 96–99 (1955); Note, Applicability of State Conflicts Rules When Issues of State Law Arise in Federal Question Cases, 68 Harv.L.Rev. 1212, 1216–17, 1227–29 (1955); cf. Texas v. New Jersey, 379 U.S. 674 (1965). See generally Restatement (Second), Conflict of Laws §§ 332b, 346h (Tent. Draft No. 6, 1960); id. § 379 (Tent. Draft No. 9, 1964).

6. Even less can the recent decision in United States v. Atlas Life Ins. Co., 85 S.Ct. 1379 (1965) be taken as an authoritative consideration of the nature of the cash surrender value for the purposes of tax lien and levy. There the Court was concerned with taxation of

Subsequent to assessment of a deficiency, but in the absence of a levy, Bess had died. His wife, as the beneficiary, received the entire proceeds of the policy. The Government sued her under section 311 (§ 6901) to recover the amount of Bess's taxes due; she was sued as a "transferee" of the taxpayer's property. The District Court, 134 F.Supp. 467, found her to be such and awarded the Government $8,874.00. Mrs. Bess had received $63,576 on the policy, the cash surrender value as of death being $3,362. On appeal, the Third Circuit, 243 F.2d 675, held that Mrs. Bess was a transferee only to the extent of Bess's property rights under the policy, which was the cash surrender value. The Supreme Court affirmed, but on an entirely different ground, namely, that a lien attached to Bess's property rights under the policy (the cash surrender value) and to the extent that the amount paid to Mrs. Bess represented that value, the lien was enforcible against her. Rejecting the contention that the insured's rights with respect to the cash surrender value expired on his death, the Court likened it to a fund, the amount of which then existing was a severable part of the total proceeds going to the beneficiary.[7] In Bess, therefore, it did not particularly matter whether the lien was seen as attaching to an identifiable fund called the cash surrender value, or to Bess's right to demand such an amount. Because Bess's death had finalized matters in its implacable way, the Supreme Court did not have to consider the dynamics of the situation prior to death. In Bess, the future was quite irrelevant.

Here, however, at the time the Government insists that its rights were established, the future was quite relevant to Mitchell, the insurers and the beneficiaries. The cash surrender value and the other policy rights and obligations were still subject to change for many reasons. In the more complicated situation before us, it is more helpful to say that the lien attached to Mitchell's rights to property, one of which was his right to collect a cash surrender value " 'from the insurance companies in accordance with the terms of the policies'. " 357 U.S. at 56, 78 S.Ct. at 1058.

The Government's third proposition is that since, the property, i. e., as it assumes the cash surrender value, can be reached by the lien, therefore "the cash surrender value of an insurance policy can be reached by levy," and the insured's request and surrender of the policy are not necessary to the effectiveness of the levy. We may assume that property subject to the tax lien is also subject to levy. See Pyle, Liability of Life Insurance and Annuities for Unpaid Income Taxes of Living Insureds, Annuitants, and Beneficiaries, 9 Tax L.Rev. 205, 227–28 (1954). But see United States v. Metropolitan Life Ins. Co., 130 F.2d 149, 151 (2d Cir. 1942); United States v. Aetna Life Ins. Co., 46 F.Supp. 30, 36 (D.Conn.1942). The Code literally says so, although the phraseology of some of the levy and distraint provisions seems inapropos to certain intangible property rights. We also accept for the moment the Government's argument that a levy operates to reduce personal property of the tax debtor to the possession of the Government, see Freeman v. Mayer, 253 F.2d 295, 298 (3d Cir. 1958) (accounts receivable); Rosenblum v. United States, 300 F.2d 843 (1st Cir. 1962), or, because of the inaptness of possessory concepts to intangible rights, at least as an assignment of the taxpayer's claim, see In re Cherry Valley Homes, Inc., 255 F.2d 706, 707 (3d Cir.), cert. denied, sub nom Dubois v. United States, 358 U.S. 864, 79 S.Ct. 96, 3 L.Ed.2d 97 (1958) (liquidated debt).

---

the income of life insurance companies under Int.Rev.Code of 1954 §§ 801–820.

**7.** Had there been no assessment prior to Bess's death and, consequently, no lien,

the Government would not even have been entitled to the cash surrender value as of death. See Commissioner of Internal Revenue v. Stern, 357 U.S. 39, 78 S.Ct. 1047, 2 L.Ed.2d 1126 (1958).

The Government is not content with the proposition that levy vests the Government with the insured's rights with respect to the policies. In addition, it claims that the language of the notice of levy quoted above "was the clearest notice to the insurers, in full accord with the provisions of the insurance contract requiring notice of assignment and demand for the cash surrender value, that the Government was the owner or assignee of all the rights of the insured and that it demanded the cash surrender value." However, not only were Mitchell's rights to be paid the cash surrender value conditioned on a written election and surrender of the policy, but any assignment also had to be in writing and indorsed on the policy. Were we to decide that mere levy vested the Government with Mitchell's rights then we might be more inclined to let notice of levy serve not only as the required notice of assignment, but also as a written election to take the cash surrender value —even though the Government might be able to realize more by letting the policy mature or by foreclosing its lien at a later date. Still, that would leave the question of surrender of the policy, an act said to have as its sole purpose the protection of the insurer against further claims. Cf. Royal Arcanum v. Behrend, 247 U.S. 394, 401, 38 S.Ct. 522, 62 L.Ed. 1182 (1918).[8]

Under the Government's view of the effect of a mere notice of levy, all rights of the insured and the beneficiaries would be irretrievably lost. The policy would be terminated and not open to reinstatement. The insured might no longer be insurable, and his death in the interim after levy would no longer leave that cushion that had been built up and counted on. See Equitable Life Assur. Soc'y v. United States, 331 F.2d 29, 36, 37 (1st Cir. 1964). The beneficiary or someone else may have been paying the premiums, yet their interests would be extinguished, cf. United States v. Fried, 309 F.2d 851 (2d Cir. 1962); Duke v. United States, 343 F.2d 294 (D.C. Cir. 1964). Such a drastic alteration of rights and obligations can come about, under the Government's argument, with no notice required to be given to the beneficiaries.[9] Yet it may be that under the applicable state law, the beneficiaries' consent is normally required before the cash surrender value may be taken, cf. Rowen v. Commissioner, 215 F.2d 641, 648 (2d Cir. 1954). Also, the right of redemption provided by section 3696 (§ 6337(a)) would be of little value if the levy itself had the effect of terminating the policy, which would seem to be the result of freezing the cash surrender value. See United States v. Sullivan, 333 F.2d 100, 117–18 (3d Cir. 1964), 18 Vand. L.Rev. 805 (1965). A bankruptcy trustee's title is not so pervasive as that. See

8. It is true that in some cases surrender of a tangible evidence of indebtedness or other obligation required by contract or by state law will not be required of the Government. However, those cases all seem to involve items like bank account passbooks, see United States v. Manufacturers Trust Co., 198 F.2d 366, 369 (2d Cir. 1952); United States v. Emigrant Industrial Sav. Bank, 122 F.Supp. 547, 549 (S.D.N.Y.1954); cf. Commonwealth Bank v. United States, 115 F.2d 327 (6th Cir. 1940); negotiable instruments, cf. United States v. Scheuermann, 106 F.Supp. 86 (E.D.Mo.1952); negotiable warehouse receipts, see United States v. Caldwell, 74 F.Supp. 114, 118 (M.D.Tenn.1947); or corporate stock, see United States v. Scheuermann, supra, where transfer of the taxpayer's interest to the Government does not inevitably result in an irrevocable forfeiture of the rights of the taxpayer or of others interested in the policy, as would be the case if the taxpayer should eventually be able to satisfy the tax debt or if the assessment should be found erroneous, and where the obligation is usually fixed. As noted in a bank account case, "the public policy favoring facilitation in the collection of taxes [is not] * * * permitted to outweigh the letter of the arrangement between bank and depositor where * * * prejudice could result * * *." United States v. Emigrant Industrial Sav. Bank, supra, 122 F.Supp. at 550.

9. The taxpayer, at least, must be notified. Section 3693(a) (§ 6335(a)).

section 70(a), Bankruptcy Act, 11 U.S.C.A. § 110(a).

The Government tries to ameliorate these consequences by saying that "the levy does not require an immediate cancellation of the insurance policy." It is true that the insurer reserves the right to defer payment of the cash surrender value for 90 days after demand for it, but the policies, including the insurers' liability upon the death of the insured, would still by their terms seem to terminate with the demand. Moreover, if other provisions of the policy were not to apply to the Government, it is not clear why the 90-day provision would stand in any better position. The Government suggests that the insurer could protect itself by seeking an adjudication of the competing rights in the policy and that "so long as it keeps the fund intact, it can hold the cash surrender value until the rights to it are adjudicated." See also Rev.Rul. 56–48, 1956–1 Cum.Bull. 561. But the cash surrender value is not like the unpaid wages of city employees involved in Hoye v. United States, 277 F.2d 116 (9th Cir. 1960). Compare Sims v. United States, 359 U.S. 108, 79 S.Ct. 641, 3 L.Ed.2d 667 (1959). At some points in time, the cash surrender value might have to be used by the insurer to cover the costs of insurance for this period during which the Government suggests the policy is still viable. And, preservation of the cash surrender value will not always be great comfort to others than the insurer who are interested in the policy; insurance is their concern, not surrender.

■ We recognize that technical surrender is not a prerequisite to the existence of a lien against the insured's right to the cash surrender value, see United States v. Bess, supra; United States v. Sullivan, supra, 333 F.2d at 122 (Hastie, J.; dissenting). But that is not our problem here. We also recognize that in United States v. Metropolitan Life Ins. Co., 256 F.2d 17 (4th Cir. 1958), surrender was held unnecessary to the Government's enforcement of its lien on the insured's right to take the cash sur-

render value. In that case the Government sued under the same section initially relied on here. The insured, the insurers and the beneficiaries were all parties. Judge Parker held that that action to enforce the lien amounted to an election of the taxpayer-insured's right to take the cash surrender value. Surrender of the policies would be desirable, but if the insured was beyond the court's jurisdiction, as he was there, "the interest of the insurer will be protected by the judgment of the court." 256 F.2d at 25. While the opinion does not indicate the precise time at which the cash surrender value was to be determined, the reference to payment under court order suggests that the election is not complete until the judgment of foreclosure is obtained. This conclusion is sound for only then will all parties be protected. See United States v. Wilson, 333 F.2d 137, 143–145 (3d Cir. 1964); United States v. McWilliams, 234 F.Supp. 117, 123–124 (D.Conn.1964).

According to its complaint, the Government began this action under Int.Rev. Code of 1954 § 7403, to enforce its lien. Under Metropolitan Life, then, it would be entitled to exactly what the District Court awarded—the value available to the taxpayer as of the judgment. On appeal, however, the Government has treated the action as one against the insurers under Int.Rev.Code of 1954 § 6332 to recover penalties for their failure to surrender property belonging to Mitchell. Although the actions are quite distinct, procedurally and substantively, it makes little difference here and we shall consider both theories. See United States v. Sullivan, supra, 333 F.2d at 115 n. 30.

Persons are liable for the penalty for failing to surrender property only when they possess property to surrender. The possessor of tangible property may be readily identified because of the physical nature of such possession. Intangible property, however, is just a theoretical bundle of rights and obligations. We share Judge Learned Hand's view that it is solecistic to talk of a promisor as

"possessing" and able to "surrender" his promisee's property, which consists solely of his promise. United States v. Metropolitan Life Ins. Co., 130 F.2d 149, 151 (2d Cir. 1942). Mitchell's rights to property consisted of an aggregation of intangible rights and possibilities: to change beneficiaries, to assign the policy, to borrow against the policy, and to terminate the policy and take the cash surrender value, to name a few. Each insurer had corresponding alternative and overlapping obligations to Mitchell and the beneficiaries. Crystallization of the obligations of each was contingent upon certain specified conditions.

But merely because the insurers were contingently obliged to Mitchell, they cannot be said to have held "property" belonging to him. For this reason, the Government is incorrect in dismissing a series of cases decided twenty or so years ago, all under section 3710(b) for failure to surrender property, reaching results with which we agree. See United States v. Massachusetts Mut. Life Ins. Co., 127 F.2d 880, 883 (1st Cir. 1942); United States v. Penn Mut. Life Ins. Co., 130 F.2d 495, 498 (3d Cir. 1942); United States v. Aetna Life Ins. Co., supra; cf. United States v. Metropolitan Life Ins. Co., supra.[10]

The insurer does not "possess" the cash surrender value until an election by the person having the right to do so has been made to take it. That was never done here. In any case, a levy, unlike a lien, see Glass City Bank v. United States, 326 U.S. 265, 66 S.Ct. 108, 90 L.Ed. 56 (1945), does not apply to after-acquired property; therefore a new levy would seem necessary to reach the cash surrender value when it is eventually demanded. See generally

Pyle, supra, 9 Tax L.Rev. at 325, 329–30, 340–42. Moreover, it is doubtful whether even a timely levy could reach loan values and nonforfeiture options because they are all the result of the insured's election to use funds only for a specific purpose. See id. at 330–32.

In any case, we are not convinced that mere notice of levy, without a subsequent distraint sale, is sufficient to vest the Government with the insured's rights under the policy, see United States v. Sullivan, supra, 333 F.2d at 115–120; compare § 70(a) Bankruptcy Act, 11 U.S.C.A. § 110(a), even if it is enough where the property in question is only a specific sum of money, see Sims v. United States, supra; Hoye v. United States, supra; or the right to only such a sum, cf. United States v. Hubbell, 323 F.2d 197 (5th Cir. 1963). Hubbell held only that a federal tax lien attached to a taxpayer's right of action; the Government's lien was held prior to other claims against the judgment that had ultimately been recovered. More was involved here than just Mitchell's right to take the cash surrender value. Under the policy he had a number of rights, some alternative, some cumulative. The owner of the policy or assignee of any rights could exercise those rights only in accordance with the policy provisions, and the total value of the combination of rights might well exceed the then cash surrender value. We think it better to require that the policy or the policy rights be sold to recover their maximum value, as was done with the annuity contract in Cannon v. Nicholas, 80 F.2d 934 (10th Cir. 1935). If bids do not meet the Government's upset price, then the Government may purchase the property rights and exercise

---

10. The Third Circuit's decision in Penn Mutual was specifically reaffirmed in United States v. Sullivan, supra, 333 F. 2d at 111, as being unaffected by Bess. In affirming a judgment of foreclosure against matured endowment policies held by the insured, the First Circuit in Equitable Life Assur. Soc'y v. United States, supra, 331 F.2d at 34–38, also found its decision in Massachusetts Mutual unscathed by Bess. The Second Circuit will soon have a chance to consider the vitality of its decision in Metropolitan Life. See United States v. Birrell, 233 F.Supp. 921 (S.D.N.Y.1964), appeal docketed, No. 29390, Dec. 18, 1964 (2d Cir.      ).

them to the same extent that the insured could have. Even if the insured's only interest in the policy is the right to borrow against it, that right can be sold. See United States v. Trout, 46 F.Supp. 484 (S.D.Cal.1942).

But whether the Government obtains the insured's right by sale, or even merely by levy, we conclude further that in the absence of a court order the particular rights available to the insured can be exercised by the Government only in accordance with the terms of the policy. We therefore reject the idea that notice of levy obliges the insurer to pay the cash surrender to the Government, just as we have rejected the idea that the tax lien attaches to the cash surrender value itself rather than to the insured's right to obtain the cash surrender value. The only decision to the contrary is United States v. Salerno, 222 F.Supp. 664 (D.Nev.1963), which relied essentially on dicta in United States v. Brody, 213 F.Supp. 905 (D. Mass.1963), which were discredited on appeal in Equitable Life Assur. Soc'y v. United States, supra, 331 F.2d at 37. Furthermore, on appeal to the Ninth Circuit, Salerno was limited to a holding that "the right of the insured in an unmatured policy to demand the cash surrender value constitutes property to which a lien attaches * * *." Mutual Life Ins. Co. v. United States, 343 F.2d 71, 73–74 (9th Cir. 1965); however, "levy and demand upon the insurer did not, without further proceedings, give rise to an obligation on the part of the insurance company forthwith to cancel the policy and make payment to the United States of the cash surrender value." Id. at 74.

To summarize, the federal tax lien arises and attaches to the taxpayer's rights under the policy. Those same rights may be levied upon and sold at a distraint sale. Enforcement of the lien can reach the cash surrender value as of the date of judgment of foreclosure. Prior to an election by the taxpayer to take the cash surrender value, the levy can reach only taxpayer's rights to make various elections. After purchasing those rights, the Government may make the elections as provided in the policy. Otherwise, it is entitled only to the proceeds of the distraint sale. If the taxpayer has made an effective election to take the cash surrender value but has not yet been paid, a levy can reach that value, which the insurer should be deemed to possess. For failing to surrender the cash surrender value to the Government in such circumstances, the insurer would be subject to the statutory penalty. In most circumstances, a levy will not reach the cash surrender value when the insured has elected, before or after the levy, to have it used for certain of the limited purposes specified in the policy, such as automatically extended insurance, automatic premium loans, or policy loans. See Comment, Effect of Federal Tax Lien on Cash Value of a Life Insurance Policy, 10 S.Dak.L.Rev. 154 (1965).

Therefore, if this action is treated as one to enforce its lien the Government received all to which it was entitled—the value available to the insured as of judgment. If the action is treated as one to recover the penalty for failing to surrender property the Government was entitled to nothing, since the insurers possessed none of Mitchell's property when levy was made. As the only company which could complain about the difference—New England—has not appealed, the judgment must stand.

Judgment affirmed.