NOMELLINI CONSTRUCTION CO.,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

UNITED STATES of America,
Third-Party Plaintiff,

v.

Robert SIMPSON, H. L. Scarborough and Billy D. Machen, d/b/a Simpson & Scarborough, Third-Party Defendants.

Civ. No. 8784.

United States District Court,
E. D. California.

June 3, 1971.

Robert A. Haughwout, Mazzera, Snyder & DeMartini, Stockton, Cal., for plaintiff.

John P. Hyland, U. S. Atty., Richard L. Carico, Sp. Asst. U. S. Atty., San Francisco, Cal., for the United States.

## MEMORANDUM AND ORDER

### MacBRIDE, Chief Judge.

Nomellini Construction Company originally commenced this case in the Superior Court of San Joaquin County to quiet title to certain personal property encumbered with government tax liens. The United States removed the action to this Court, however, and counterclaimed to foreclose its liens and to impress Nomellini with personal liability for converting the liened property. The conflict arose shortly after Nomellini had seized money and construction equipment from a partnership known as Simpson & Scarborough, which had incurred tax delinquencies in an amount exceeding $30,000. Essentially, the government contends that its tax liens had attached to the delinquent taxpayer's property prior to Nomellini's seizure and now provide a predicate for its counterclaims. Nomellini, on the other hand, claims a right to possess the equipment and money free of the government's interests. The facts appear below in more detail together with my conclusions.

### The Tax-Liened Equipment: Nomellini's Claim to Priority

A general contractor, Nomellini Construction Company had undertaken a housing project in Stockton, California, sub-contracting its cement work to the Simpson & Scarborough partnership. By the end of 1961, the partnership had become heavily indebted to Stockton Building Materials Company, which had supplied concrete for the Stockton job. Soon apparent that the partnership could not pay its debt, the president of Stockton Building Materials Company threatened Nomellini with a mechanic's lien. To resolve the impasse, Nomellini convened a meeting on January 12, 1962, with the partnership and its creditor. During the meeting, Nomellini agreed to assume the partnership's debt in return for the creditor's promise not to lien the job.

After the meeting, Nomellini told Simpson, the partnership's spokesman, that he wanted all of the partnership equipment. Simpson replied, "If that is the way it has to be, that is the way it will be." Nomellini assured Simpson that he could continue to use the equipment as needed. Simpson then agreed to deliver the equipment to Nomellini's construction yard, but never did so. Between February 6 and 16, however, Nomellini sent his own employees to seize the equipment at a construction lot in Stockton, where they retrieved most of it. Several months later Nomellini located and seized the remaining equipment.

A few days after the January 12 meeting, Simpson sent Nomellini a list of partnership equipment, but they did not reduce their agreement to writing. They did execute a bill of sale purportedly signed on January 15, 1962, but this was post-dated and not in fact executed until sometime after February 16, 1962. Furthermore, Nomellini did not apply for a transfer of title to his newly-acquired vehicles.

In the meantime, the federal government assessed employment and withholding taxes against the partnership, and these remain unpaid in the amount of $30,032.65. Under § 6321 of the Internal Revenue Code, this amount became a lien upon all of the delinquent taxpayer's property on the assessment date, February 2, 1962. The United States filed notice of its lien on February 16, 1962, and two weeks later served a notice of levy upon Nomellini. With the exception of a 1960 F–600 Ford truck, Nomellini refused to relinquish any of the equipment and eventually brought the quiet title action which led to this lawsuit.

On these facts, Nomellini seeks the protection of § 6323 of the Internal Revenue Code of 1954:

> Except as otherwise provided in subsections (c) and (d), the lien imposed by section 6321 shall not be valid as against any mortgagee, pledgee, purchaser, or judgment creditor until no-

tice thereof has been filed by the Secretary or his delegate. * * *[1]

It claims a "purchaser" priority by virtue of the January 12, 1962, transaction in which it assumed the partnership's indebtedness in return for the equipment.[2] This question, of course, is to be resolved in light of federal law. Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960).

█ Neither § 6323 nor other provision of the 1954 Code defines the term "purchaser", and cases construing it do little to sharpen its meaning. The Supreme Court has said, for example, that a purchaser within the purview of § 6323 "usually means one who acquires title for a valuable consideration in the manner of vendor and vendee." United States v. Scovil, 348 U.S. 218, 75 S.Ct. 244, 99 L.Ed. 271 (1955). Citing Scovil, the Ninth Circuit has added that § 6323 protects purchasers "in the ordinary sense." United States v. Hawkins, 16 Alaska 36, 228 F.2d 517 (9th Cir. 1955). Internal revenue regulations are consistent with both of these decisions.[3]

Viewed in the "ordinary sense", the Nomellini-Simpson & Scarborough transaction hardly supports the plaintiff's claim to a purchaser priority. First, Nomellini's demand for the equipment and Simpson's reluctant assent—"If that is the way it has to be, that is the way it will be"—do not comprise a "sale", at least under traditional concepts of offer and acceptance. Nomellini did not offer to "buy" the equipment, and the partnership certainly did not agree to "sell" it. Indeed, the vagueness of the transaction convinces me that not even the parties themselves knew what they intended to be the ultimate result. Second, the transaction lacks another essential indicia of a sale, agreement on a purchase price. In return for his assumption of the indebtedness, Nomellini demanded all of the partnership equipment without knowing its quantity or value and without deciding whether to pay or retain $37,000 then owing to the partnership for work on the Stockton job. Finally, the fact that Nomellini did not transfer title to the vehicles or take immediate possession of them, almost automatic steps for true purchasers, illustrates its complete lack of intention to "purchase" the equipment.[4] See California Vehicle Code § 5600 and former Civil Code § 3440.

As these facts exhibit, not even the parties themselves had defined their transaction. Indeed, it appears to me that Nomellini purposefully left it open to permit him to confirm, modify, or revoke the arrangements, depending upon the partnership's future financial stability. To conclude that this arrangement constituted a true sale simply ignores the facts. The most to be said is that the form of the transaction was left in limbo and was not to be consummated until some future date.

---

1. The parties agree that this case is governed by the collection provisions of the code as they existed prior to their extensive 1966 amendments.

2. Nomellini does not claim to be a mortgagee, pledgee, or judgment creditor and, consequently, I consider only its claim to purchaser status. Moreover, it has not argued that the taxpayer, by virtue of the January 12 agreement, had divested himself of any property to which the tax liens could attach. See Aquilino v. United States, supra.

3. Regs. § 301.6323–1 provides that "The term 'purchaser' means a person who, for a valuable present consideration, acquires property or an interest in property."

4. The government eventually levied upon the title certificates in Simpson's hands. For over nine months after the alleged sale, Nomellini had not even bothered to get them from Simpson. Certainly, nine months is ample time within which to transfer ownership and is far beyond the allowed ten days. See Vehicle Code § 5902.

   Furthermore, former Civil Code § 3440, effective at the time of these transactions, provided that a sale of personal property without immediate delivery was conclusively presumed fraudulent as against the transferor's creditors. In view of this provision, a true purchaser would obviously take immediate possession of the goods to preserve his interest.

■ Nomellini's failure to perfect the transfer supplies an additional reason for rejecting his bid for priority.[5] Under California law, as I have pointed out, Nomellini should have transferred title to the vehicles and taken immediate possession of the equipment to fully protect his rights.[6] While federal law determines rights to priority, the Supreme Court has recognized in an analogous situation that failure to perfect one's interest under *local law* is "practically conclusive" on the priority issue. United States v. Security Trust and Savings Bank, 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53 (1950). Accordingly, some opinions have denied priority to sales left unperfected under local law. Leipert v. R. C. Williams & Co., 161 F.Supp. 355 (S.D. N.Y.1957); see also Allen v. Diamond T Motor Car Co., 291 F.2d 115 (10th Cir. 1961). Admittedly, other opinions have awarded priority in similar circumstances, but in these cases only minor technicalities prevented the purchasers from obtaining perfected title. See United States v. Boston & Berlin Transportation Co., 188 F.Supp. 304 (D.C.N.H.1960); see also Gauvey v. United States, 291 F.2d 42 (8th Cir. 1961). This case, in contrast, displays fundamental omissions which persuade me to follow those opinions denying priority.[7]

For these reasons, therefore, I conclude that the partnership property in Nomellini's hands is burdened with the government's tax liens. I shall now consider the remaining issues.

### Government's Conversion Claim

■ Not content merely to impress its liens, the United States seeks to recover the value of the Simpson & Scarborough equipment in Nomellini's hands. Originally, it sued for such recovery under the common law of conversion and under § 6332 of the Internal Revenue Code, which imposes liability upon persons who refuse to surrender levied property. It has now abandoned its statutory claim, however, and has rested entirely upon its conversion theory.

Section 6332 of the Internal Revenue Code [8] authorizes the Secretary to demand surrender of levied property and imposes personal liability to the extent of the value of the property on those who refuse to comply. Invoking this provi-

---

5. My previous ruling does not bar me from discussing the effect of state law upon the priority issue. That opinion merely held that federal law determines the priority issue and the state law *in itself* is not necessarily dispositive.

6. Absent application for a new title certificate, no interest passes to the transferee (Vehicle Code § 5600), and a sale without a transfer of actual possession is void vis-a-vis competing creditors. Former Civil Code § 3440. The United States is entitled to invoke the protection of these statutes to the same extent as non-governmental creditors. See United States v. Creamer Industries, 349 F.2d 625 (5th Cir. 1965).

7. The 1966 amendments to § 6323 deny priority to claimants who fail to perfect their interests under state law. While these amendments do not govern this case, they do represent Congressional satisfaction with that line of case denying priority to sales left unperfected under state law.

8. Section 6332. Surrender of property subject to levy.

(a) Requirement.

Any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary or his delegate, surrender such property or rights (or discharge such obligation) to the Secretary or his delegate, except such part of the property or rights as is, at the time of such demand, subject to an attachment or execution under any judicial process.

(b) Penalty for violation.

Any person who fails or refuses to surrender as required by subsection (a) any property or rights to property, subject to levy, upon demand by the Secretary or his delegate, shall be liable in his own person and estate to the United States in a sum equal to the value of the property or rights not so surrendered, but not exceeding the amount of the taxes for the collection of which such levy has been made, together with costs and interest on such sum at the rate of 6 percent per annum from the date of such levy.

sion, the government served Nomellini with a notice of levy pursuant to § 6331 of the Code and Regs. § 301.633–1 and demanded surrender of the Simpson and Scarborough equipment. Nomellini refused, however, and eventually sold some of the equipment, intermingled it with his own equipment, and permitted the remainder to rust away to "junk", as Mr. Nomellini characterized it at trial.

Notwithstanding Nomellini's complete disregard of the levy, the government later chose to forego suit under § 6332, apparently feeling that a technical deficiency in its notice prevented a valid levy.[9] Instead, it chose to rely entirely on a long-standing remedy, available to the government as well as to private litigants, which permits a conversion action against defendants who intentionally impair a lienor's security. United States v. Matthews, 244 F.2d 626 (9th Cir. 1957); George Adams & Frederick Co. v. South Omaha National Bank, 123 F. 641 (8th Cir. 1903); United States v. Allen, 207 F.Supp. 545 (E.D.Wash. 1962); United States v. Webster-Robinson Machinery & Supply Co., 65–1 U.S. T.C. ¶9255, 15 A.F.T.R. 2nd 453 (W.D. Wash.1965). Nomellini contends, however, that § 6332 provides the *exclusive* means of imposing liability and that the government's abandonment of the claim, therefore, bars its recovery.[10] For reasons to be explained, I reject the argument and find for the government on its conversion theory.

Although Nomellini cites no authority to support its argument, it apparently hopes to invoke the rule that a remedy in a statute creating a new right is the exclusive means of enforcement. See United States v. Babcock, 250 U.S. 328, 39 S.Ct. 464, 63 L.Ed. 1011 (1919). A close examination of the history and purpose of § 6332, however, will reveal that this is an inappropriate case in which to apply the rule.

At one time, the Internal Revenue Service was powerless to force the surrender of a delinquent taxpayer's property in the hands of third persons, who could thus refuse to relinquish the property and thereby frustrate a tax sale. United States v. Metropolitan Life Ins. Co., 130 F.2d 149 (2nd Cir. 1942). To remedy this obvious oversight, Congress enacted the predecessor of § 6332, requiring the surrender of levied property on demand and enforcing the newly-created right with a penalty equal to the value of the property. Since the statutory penalty enforced a new right, therefore, it was arguably intended to be the exclusive means of recovering damages *for failure to surrender* the equipment. In this case, however, the conversion action rests not upon Nomellini's refusal to relinquish the equipment after demand, but upon his subsequent conduct rendering the government's liens valueless. Under these circumstances, § 6332 was certainly never intended to foreclose the government from its common law remedies.

The statutory and common law remedies redress different evils. The manifest purpose of § 6332 is to force the physical surrender of levied property to permit administrative sale, while the common law remedy casts a wider net to provide relief for any tortious act which impairs the lienor's interest in the converted property. With one exception,[11]

---

9. The government abandoned its § 6332 action as soon as Nomellini asserted in the Pre-trial Order that the notice of levy addressed jointly to Nomellini Construction Co. and Lathrop Construction Co. did not bind Nomellini in its individual capacity.

10. Nomellini thrusts its entire argument toward the exclusive remedy issue. It does not attack the general principle that a conversion action will lie against one who impairs a lienor's security. I

must assume, therefore, that it acknowledges the propriety of a conversion action, assuming I find the § 6332 remedy not to be exclusive.

11. When the allegedly converting act is a single demand and refusal, the two remedies may overlap. In this case, and only in this case, does the difficult question arise of whether the statutory remedy is exclusive. As I have pointed out, the government here does not rest its claim upon demand and refusal.

therefore, one remedy does not necessarily include the other. Under these circumstances, I cannot conclude that the creation of one narrow remedy was meant to eradicate all other established forms of relief.

The facts of this case do not invoke much sympathy for Nomellini's position. True, the government's deficient levy perhaps justified Nomellini's refusal to relinquish the equipment (see United States v. O'Dell, 160 F.2d 304 (6th Cir. 1947)) and may have even permitted it to use the equipment in a manner which would not imperil the tax liens. Having knowledge of the government's claims, however, it had no right to ignore them, dissipate the entire security, and thus render the claims valueless.[12] A prudent property holder believing the levy to be unlawful would have preserved the security and applied for a release of the levy under § 6343 of the Internal Revenue Code. Discovery of a minor technicality in the notice of levy should not permit one to dispose of tax-liened property with impunity. In short, those like Nomellini who choose "to shoot first and ask questions later" must pay for their errors.

Left to be decided is the difficult question of valuation. The list below, compiled from all the evidence and from Joint Exhibit #5, represents (1) the items which I find Nomellini to have converted in disregard of the government's liens, and (2) their values at time of conversion.

| | | |
|---|---|---|
| 1. | 1947 Ford 2-ton dump truck | $    250.00 |
| 2. | 1946 White Water truck | 250.00 |
| 3. | 1948 Dodge pickup truck | 150.00 |
| 4. | Large equipment trailer | 1,500.00 |
| 5. | Small equipment trailer | 500.00 |
| 6. | Aljoa Sportsman house | 800.00 |
| 7. | Gar-bro power buggy | 200.00 |
| 8. | Flatbed tilt trailer | 1,500.00 |

12. At common law, Nomellini's treatment of the liened property clearly constitutes conversion. See 53 Am.Jur., Trover & Conversion § 55 (commingling goods), § 51 (permitting the goods' destruction), and § 35 (selling the goods to another).

13. The contract between Simpson & Scarborough and the Joint Venture required

| | | |
|---|---|---|
| 9. | Davis ditch digger | 3,000.00 |
| 10. | Two electric generators | 300.00 |
| 11. | Five trowel machines | 800.00 |
| 12. | Three sidewalk machines | 1,500.00 |
| 13. | Schramm air compressor | 400.00 |
| 14. | Four cement vibrators | 200.00 |
| 15. | Two 2-wheel buggies | 100.00 |
| 16. | Black & Decker hammer | 85.00 |
| 17. | 900 steel stakes | 750.00 |
| 18. | Steel curb and gutter forms | 1,000.00 |
| 19. | Plaster mixer on trailer | 150.00 |
| 20. | 200 steel panels for forms | 2,000.00 |
| 21. | 1956 Ford 1-ton pickup truck | 100.00 |
| | TOTAL...... | $15,535.00 |

### Joint Venture Funds

In addition to the value of the equipment, the United States seeks to recover cash in the amount of $11,738.95. It rests its claim upon Nomellini's seizure of two distinct sums of money allegedly owing to the taxpayer, Simpson & Scarborough, under a construction contract. The facts and my conclusions follow.

Simpson & Scarborough, the defaulting taxpayer, had subcontracted the cement work on a joint venture project run by Nomellini Construction Company and Lathrop Construction Company. On March 1, 1962, two weeks after the filing of the tax liens, the United States served its notice of levy upon the joint venture, intending to seize the taxpayer's right to payment under the construction contract. On March 26, 1962, the joint venture issued a check for $10,000 drawn jointly to Nomellini and the taxpayer, who immediately endorsed it to Nomellini. Further, when the taxpayer had finished his cement work, the joint venture owed it $1,738.95, the amount of the contract price remaining after settlement of laborers and materialmen's claims.[13] Although it was owing to the partnership under its contract, Nomellini seized the $1,738.95, ostensibly to satisfy the partnership's obligation on a collateral debt.

On these facts, the government claims both the $10,000 and the $1,738.95 by

that 10% of the contract price be retained to protect the joint venture from claims asserted against it for acts of the partnership. After claims in the amount of $1,067.86 were asserted, the balance due Simpson & Scarborough was $1,738.95.

virtue of its tax lien *and* its levy. For reasons which follow, I find for the government under its lien.

The government's lien arose on February 2, 1962, and became fully protected against subsequent interests on its filing date, February 16, 1962. Under § 6321 of the Internal Revenue Code, it attached not only to "all property and rights to property" belonging to the taxpayer on February 2, but also to any after-acquired property. See cases cited in 174 A.L.R. 1380.

Despite the lien's broad applicability, Nomellini contends that Simpson & Scarborough had no property interest in the money to which the liens could attach. Claiming for its major premise that a tax lien will not attach to a right to receive future earnings,[14] it concludes that an actual advance of yet-to-be-earned funds is likewise immune.[15]

Nomellini's argument is a non-sequitur. Whether or not the government's liens may attach to the ephemeral right to receive future earnings, they certainly may attach to an *actual advance* of the funds. A cash advance represents a valuable property right in the hands of its owner. Calling the money a "future advance" does not destroy its buying power or impair its value. Once in the hands of the taxpayer, therefore, the money became property enveloped with the government's liens.[16] Welsh v. United States, 95 U.S.App.D.C. 93, 220 F.2d 200 (1955); Lapp v. United States, 316 F. Supp. 386 (S.D.Fla.1970). Under accepted principles, the tax lien then followed the $10,000 advance into the hands of the transferee, Nomellini, and provides a basis of recovery. United States v. Bess, 357 U.S. 51, 78 S.Ct. 1054, 2 L. Ed.2d 1135 (1958).

True, the government cannot now point to the precise encumbered money, but several considerations convince me that this is an unnecessary requirement. First, Nomellini knew of the government's asserted interest and deliberately chose to ignore it. Its influence in the joint venture, in fact, was instrumental in securing the so-called "future advance", which was little more than a scheme to circumvent the government's claims. Second, the task of tracing money is nearly impossible and imposing such a requirement would therefore severely impede the government's collection efforts. Similarly, permitting holders of tax-liened money to escape liability by the easy maneuver of commingling funds creates an unjustified loophole. Finally, I find no compelling reason to treat the impairment of lien rights in money any more leniently than the impairment of the same rights in equip-

---

14. More precisely, Nomellini contends that a right to future earnings, in contrast to accrued but unpaid earnings, is insufficient to constitute "property" within the meaning of § 6321. Under my view of the case, I need not decide this issue.

15. Nomellini's argument, I think, confuses the government's rights under a *levy* with its rights under a *lien*. Unlike a lien, which attaches to after-acquired property, a levy is only effective on property existing on the date of levy. United States v. Mitchell, 349 F.2d 94 (5th Cir. 1965). On that date I might agree with Nomellini that the partnership had no "property right" subject to levy in its yet-to-be-earned contract price. On March 1, the date of levy, the partnership had no money due under the terms of the contract, and the government has not convinced me that on or before that date the contract price had been retro- actively increased to reflect work already performed. Because I find for the government under its lien, however, I need not decide whether the partnership had a property interest in the joint venture contract on the date of levy.

16. The fact that the check was payable jointly to the taxpayer and Nomellini does not change this result. The money was advanced to the taxpayer to enable it to pay off a collateral debt owed to Nomellini, and it was to be earned by the taxpayer alone. The only reason Nomellini, in its capacity as a member of the joint venture, joined itself as payee was to insure repayment of the loan. Under these circumstances, Nomellini can hardly claim that money used to pay off an indebtedness to it did not constitute "property" in the hands of its debtor.

**1288**

ment, which is not so easily hidden.[17] Consequently, I think the proper remedy is to impose personal liability for the value of the money, $10,000. See United States v. Matthews; George Adams & Fredrick Co. v. South Omaha National Bank; United States v. Allen; United States v. Webster-Robinson Machinery & Supply Co., *supra*.

As to the $1,738.95 remaining due to the partnership on the job's termination, the government's lien had also attached to this sum. This amount represents accrued earnings and is "property" belonging to the taxpayer, notwithstanding his indebtedness to Nomellini on a collateral obligation. See Sims v. United States, 359 U.S. 108, 79 S.Ct. 641, 3 L.Ed.2d 667 (1959). Nomellini's seizure of the money could not divest the liens, and for the reasons expressed above, Nomellini is likewise liable for this amount.

### Conclusion

For the reasons discussed, I have concluded that Nomellini is liable for $15,535.00 on the equipment and $11,738.95 on the joint venture funds, for a total of $27,273.95. I decline the government's suggestion to award pre-judgment interest, however, because damages were unliquidated and not easily determined and, in my opinion, justice requires its disallowance. United States ex rel. Carter-Schneider-Nelson, Inc., v. Campbell, 293 F.2d 816 (9th Cir. 1961); see also Robert C. Herd & Co. v. Krawill Machinery Corp., 256 F.2d 946 (4th Cir. 1958).

This Memorandum and Order shall constitute my findings of fact and conclusions of law under F.R.C.P. Rule 52.

It is therefore ordered that the plaintiff take nothing by his action to quiet title and that judgment be entered for the defendant on its counterclaims in the amount of $27,273.95.

---

17. I recognize that the negotiability of money creates unique problems which may call for relaxed rules. Section 6323 of the Code, however, creates a priority *even against filed tax liens* for those who take encumbered money without knowledge of the lien. This section, therefore, provides adequate protection for those who innocently impair the government's lien rights. Since Nomellini knew of the government's asserted interest, it cannot invoke this protection.