In re HAMILTON ASSOCIATES, INC., dba Time Development, Debtor.

No. BK–S–84–448.

United States Bankruptcy Court, D. Nevada.

Nov. 5, 1986.

Peter Reynolds, Las Vegas, Nev., for debtor.

Francis J. Morton, Las Vegas, Nev., for Sandlin Lumber.

David Bunning, U.S. Dept. of Justice, Washington, D.C., for Internal Revenue Service.

John P. Wanderer, Las Vegas, Nev., for Pioneer Citizens Bank.

Lionel, Sawyers & Collins, Las Vegas, Nev., for First American Title.

Bonnie Jean Esplin, Las Vegas, Nev., for trustee.

## ORDER

ROBERT CLIVE JONES, Chief Judge.

### FACTS

The Debtor, Hamilton Associates, Inc., dba Time Development and M & D Enterprises, ("Hamilton") engaged in business as a framing subcontractor from 1982 through 1984. Hamilton had a contract with West Coast Holdings ("West Coast") for a project known as "Newport Cove" to provide labor and materials to frame buildings under construction. Resolution of this matter requires consideration of the claims of four entities to money owed to Hamilton by West Coast. The claimants are Pioneer Citizens Bank of Nevada ("Pioneer"), Sandlin Lumber Company ("Sandlin"), the Internal Revenue Service ("IRS"), and the trustee of Hamilton's bankruptcy estate ("Trustee").

In October, 1982, Hamilton entered into an agreement with Pioneer under which Pioneer would make commercial loans to Hamilton. At that time, Hamilton signed a security agreement with Pioneer which Pioneer properly perfected. The agreement covered all obligations between Hamilton and Pioneer and gave Pioneer a security interest in, *inter alia,* all of Hamilton's inventory and accounts receivable. Pioneer also obtained a general assignment of all monies owed to Hamilton by West Coast. The assignment of funds was executed on October 8, 1982 and was duly served upon West Coast.[1]

Pioneer subsequently made a number of loans to Hamilton. On May 13, 1983, Hamilton executed a promissory note for $25,000.00 representing an actual cash advance. On August 12, 1983, Hamilton paid $1,000.00 against this note and executed a renewal note for the balance of $24,000.00. The unpaid balance on this note is $23,206.09. On March 30 and April 12, 1983 Hamilton executed two notes totalling approximately $10,000.00.[2] The amount still

---

1. A second assignment of funds was executed on February 14, 1983. That assignment, however, pertained only to funds owed to Hamilton by West Coast with respect to "Newport Cove

VIII". The present matter concerns only Newport Cove Phases 11A and B.

2. One of these notes was secured by a Xerox copier as well as by the original security agree-

due and owing on these notes is $8,939.33. The present total amount due and owing on all three promissory notes, exclusive of interest, is $32,145.42.

Sandlin's claim arises from its having supplied lumber to Hamilton for use in framing at the Newport Cove project. Between March 22, 1983, and July 30, 1983, Sandlin delivered lumber to the Newport Cove project pursuant to Hamilton's request. The lumber was incorporated in the finished product. Pursuant to the arrangement between West Coast and Hamilton, Hamilton would submit invoices to West Coast detailing its percentage of work completed and the materials provided. West Coast would in turn require Hamilton to submit lien releases for each materialman prior to payment of any funds. Hamilton would in turn pass on the materialman's funds to the materialman and retain its portion to use for its own operational purposes.

On May 25, 1983, Sandlin recorded a lien against the Newport Cove properties in the sum of $127,508.33 for materials used on Newport Cove Phases 11A and 11B. This lien remained of record until June 6, 1983, when Hamilton, West Coast and Sandlin, agreed that Sandlin would release the lien. A partial payment was made reducing the debt to $119,350.00 and it was agreed that West Coast would pay Sandlin the balance owed directly from sums not yet released by its construction lender. Sandlin received the first two installments, but not the third installment of approximately $63,-000.00.

Sandlin learned that West Coast's lender was disbursing the funds through First American Title Company ("First American"). Accordingly, on September 28, 1983, Sandlin requested that First American release the funds. On September 29, 1983, Sandlin's agent went to First American to pick up the check but was advised that it could not yet be released. As a result of not receiving the last installment,

Sandlin re-liened the Newport Cove Phase 11 project on September 30, 1983, although this lien was later held invalid because it was not timely filed. On the same day, Sandlin was notified that Pioneer had asserted a claim to a portion of the funds. Sandlin later learned that the IRS asserted a claim against the funds for taxes allegedly owed by Debtor.

The IRS claim is based upon an assessment of $67,638.25 made against the Debtor on April 11, 1983. A notice of federal tax lien was not filed, however, until October 10, 1983, and no demand was made upon First American by the IRS until November 28, 1983. The IRS has admitted in pleadings that it's claim is subordinate to that of Pioneer's, but argues that it's claim is superior to all others.

Finally, the Trustee argues that the money owed to Hamilton by West Coast is property of the estate that is not subject to the claims of any of the claimants. Rather, the Trustee argues that the money should be distributed equitably after compensating the Trustee for the costs and expenses of preserving the funds for the estate.

### DISCUSSION

#### A. *Pioneer vis-a-vis Sandlin*

■ Pioneer has two bases for asserting its rights to the disputed funds: its security interest in Hamilton's accounts receivable and the assignment of moneys owed to Hamilton by West Coast. The definition of an "account receivable" in the security agreement is "any right of [Hamilton] to payment for goods sold or leased or for services rendered." Here, Hamilton provided goods and performed services for West Coast and West Coast became obligated to pay Hamilton for them. Thus, the money owed to Hamilton by West Coast is an account receivable and is within the scope of the security agreement.

In addition, Pioneer's interest was properly perfected. The security interest had

---

ment; the other was secured by a Hendrick panel radial saw as well as by the original security agreement. Pioneer has, of course,

agreed to release the liens on the copier and the saw if the loans are paid.

attached to the collateral because (1) the agreement described the collateral and was signed by Hamilton; (2) Pioneer had given value by lending money to Hamilton; and (3) Hamilton had rights in the collateral in that, having performed the framing work, West Coast was obligated to make payment. *See* Nev.Rev.Stat. § 104.9203(1), (2). Pioneer also had satisfied the requirements for perfection by filing a financing statement covering the collateral with the secretary of state. *See* Nev.Rev.Stat. § 104.-9302, 9401. Pioneer therefore has a valid, perfected security interest in the money owed to Hamilton by West Coast.

▮ Additionally, however, Pioneer is protected by virtue of the assignment of moneys owed to Hamilton by West Coast. A contractor may assign moneys due under a contract even when the contract itself is not assignable and where the moneys are not yet due. *Valley National Bank v. Byrne*, 101 Ariz. 363, 419 P.2d 720, 722 (1966); *Farmers Acceptance Corp. v. De-Lozier*, 178 Colo. 291, 496 P.2d 1016, 1017 (1972). If notice of the assignment is given to the obligor, he must make payment to the assignee. *Van Waters & Rogers, Inc. v. Interchange Resources, Inc.*, 14 Ariz. App. 414, 484 P.2d 26, 29 (1971); *United Bank v. Romanoski Glass & Mirror Co.*, 14 Ariz.App. 90, 480 P.2d 1007, 1009 (1971); *Whisler v. Whisler*, 9 Kan.App.2d 624, 684 P.2d 1025, 1027 (1984); *McCallums, Inc. v. Mountain Title Co.*, 60 Or.App. 693, 654 P.2d 1157, 1159 (1982).

▮ On October 8, 1982, Hamilton executed an assignment to Pioneer of "all moneys now due or which may hereafter become due to the Assignor from West Coast Holdings under all contracts, obligations, notes, chattel paper, purchase orders, or otherwise." West Coast received notice of the assignment on October 11, 1982. Thus, Hamilton had assigned to Pioneer its rights to receive payments due from West Coast before the claims of Sandlin or the IRS arose. Having received notice of the assignment, West Coast was liable to Pioneer and no subsequent assign-

ment could deprive Pioneer of its prior rights as an assignee.

▮ Nevertheless, Sandlin argues, without citation to authority, that because it had a superior claim to the funds by virtue of its materialman's lien, and because it released the lien pursuant to the June 6 agreement, it is entitled to prevail in its claim to the funds. The theory underlying this argument is that the property owner has the power to redirect payment of funds from a contractor to a materialman's lien holder in order to keep title to the property clear. The Court disagrees.

The authority that most nearly supports Sandlin's argument is section 108.235 of the Nevada Revised Statutes. Under that provision, if a materialman's lien is recorded and an action on the lien is commenced, the property owner "may withhold from the contractor the amount of money for which such lien is filed." Nev.Rev.Stat. § 108.235(2). If the lien holder obtains a judgment against the property owner, the owner may deduct that amount from any amount owed to the contractor. *Id.* Thus, a property owner has a limited right to withhold funds owed to a contractor where a materialman's lien is recorded and an action on the lien is commenced.

Here, Sandlin asks the Court to hold that when a materialman's lien is recorded, the property owner may redirect payment of funds owed to the contractor (as opposed to a simple withholding) even though (1) no action to enforce the lien had been commenced, (2) the funds had previously been assigned and were subject to a security interest, and (3) the assignee/security interest holder was not given notice of the intended payment to the lien holder. This the Court can not do. Section 108.235(2) gives a property owner in this situation specific rights. The Court can find no statutory or common law granting any broader rights; i.e., the power to redirect payment without the contractor's consent. Section 108.235 also gives the contractor (and therefore its assignee or secured party) prior certain rights to defend and contest the mechanic's lien. The debtor may not

consent to such redirected payment without the consent of its assignee or secured party. Sandlin, therefore, is not entitled to prevail on the "redirection of payment" theory.

■ Moreover as Pioneer is a secured creditor the value of whose security exceeds the amount of the claim, Pioneer is, therefore, entitled to "interest on such claim, and any reasonable fees, costs or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b). The security agreement executed by Hamilton, provides that Pioneer is entitled to attorney's fees and expenses incurred in enforcing its rights under the agreement. Thus, Pioneer may recover such fees and expenses. Under section 506(b), the interest rate used in calculating the allowed secured claim is the contract rate. *See In re American Mariner Ind., Inc.,* 734 F.2d 426, 435 n. 12 (9th Cir.1984). In the case at bar, the interest rates on the three loans, which ranged from 16 to 18 percent, should therefore be applied to the outstanding balances on the respective loans in determining the amount of Pioneer's claim.

### B. *The IRS vis-a-vis Pioneer and Sandlin*

■ Section 6321 of the Internal Revenue Code ("IRC") provides:

If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount ... shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

26 U.S.C. § 6321 (1982). Once the tax has not been paid, and notice and demand have been made, the federal tax lien arises from the date of assessment. *Runkel v. United States,* 527 F.2d 914, 916 (9th Cir.1974); *Nevada Rock & Sand Co. v. United States,* 376 F.Supp. 161, 163 n. 1 (D.Nev. 1974). In the case at bar, then, the IRS claim lien against Hamilton's property arose on April 11, 1983 when the assessments were made although the notice of federal tax lien was not filed until October 10, 1983.

■ State law determines the nature of the legal interest a taxpayer has in property. Federal law governs the issue of lien priority. *Aquilino v. United States,* 363 U.S. 509, 513–514, 80 S.Ct. 1277, 1280–81, 4 L.Ed.2d 1365 (1960); *Nevada Rock & Sand,* 376 F.Supp. at 163–164. As discussed above, under state law, the money owed to Hamilton by West Coast is an account. Moreover, there is in this case, no dispute that this account was property that could be subject to the federal tax lien.

■ The only remaining issue is priority among the parties. The basic federal priority standard is "first in time, first in right." *United States v. City of New Britain,* 347 U.S. 81, 85, 74 S.Ct. 367, 370, 98 L.Ed. 520 (1974). In addition, however, section 6323 of the IRC provides:

"[t]he lien imposed by section 6321 shall not be valid against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary."

26 U.S.C. § 6323 (1982). Under both the *New Britain* rule and section 6323, Pioneer's security interest has priority over the federal tax lien because it was created and properly perfected long before the lien arose. Sandlin's claim, however, is less clear. A "mechanic's lienor" is defined in the IRC as:

"any person who under local law has a lien on real property (or on the proceeds of a contract relating to real property) for services, labor, or materials furnished in connection with the construction or improvement of such property. For purposes of the preceding sentence, a person has a lien on the earliest date such lien becomes valid under local law against subsequent purchasers without actual notice, but not before he begins to furnish the services, labor, or materials."

26 U.S.C. § 6323(h)(2). Sandlin originally had a valid materialman's lien on the Newport Cove property that became effective

on May 26, 1983. Since the IRS lien was not recorded until October 10, 1983, Sandlin's materialman's lien took priority over the IRS claim pursuant to IRC section 6323. Sandlin released that lien, however, and its subsequent attempt to re-lien the property was unsuccessful.

█ As a result, the IRS argues that Sandlin had no lien of record when the IRS recorded its notice of tax lien. The IRS therefore argues that its claim is superior to Sandlin's. According to the IRS, *Nomellini Constr. Co. v. United States*, 328 F.Supp. 1281 (E.D.Cal.1971) supports this result. Although the facts in *Nomellini* are similar to those in the case at bar, there is one critical difference. In *Nomellini*, the creditor attempting to gain priority over the IRS lien claimed it was a "purchaser" within the meaning of section 6323. The court held that, because it had not taken the necessary steps under state law to perfect the transfer of the property at issue, the creditor was not a "purchaser." 328 F.Supp. at 1284. The creditor therefore could not claim a priority over the IRS. Sandlin, in contrast, had a valid materialman's lien that gave it priority over the IRS claim pursuant to section 6323. There is no assertion that Sandlin did not originally take priority over the IRS by virtue of section 6323; the question is whether Sandlin lost its priority status by releasing its lien pursuant to the June 6 agreement. The Court concludes that it did not.

█ At the June 6, 1983 meeting, Hamilton, West Coast, and Sandlin agreed that in accordance with a stated timetable, West Coast would make payments to Sandlin in return for Sandlin releasing its materialman's lien on the Newport Cove property. Thus, the agreement was essentially a substitute for the lien. Moreover, on June 6, the IRS lien had not been recorded and there is no evidence Sandlin had actual knowledge of it. Had the IRS acted promptly to record its lien and protect its rights, Sandlin could not make this claim.[3] The Court concludes, therefore, that where a creditor with a lien that takes priority over an IRS lien under section 6323 gives up its security pursuant to an agreement providing for direct payment of the creditor, and where the creditor has neither actual nor constructive notice of the tax lien, the creditor retains its priority status. Sandlin's claim, therefore, has priority over the IRS tax lien.

### C. *The Trustee's Claim*

█ Based on the above discussion, it is clear that the Court disagrees with the Trustee's assertion that the money at issue is property of the estate free from the claims of Pioneer, Sandlin and the IRS. The Court agrees with the Trustee, however, that pursuant to sections 330(a) and 506(b) of the Bankruptcy Code, the Trustee is entitled to compensation for actual, necessary services and expenses of preserving the money at issue in this case.

### CONCLUSION

Based on the above, IT IS HEREBY ORDERED that within 30 days of the date hereof, the Trustee shall submit to this Court his claim for interim compensation and Pioneer shall submit an application for determination of the amount of its secured claim. After a hearing, the Trustee shall disburse the funds in accordance with the instructions of this Court.

---

**3.** The critical distinction in this case between Pioneer and the IRS is notice. Pioneer had a valid, perfected security interest and an assignment of which the obligor had been notified. Thus, West Coast and Hamilton had actual notice of Pioneer's interest in the funds and Sandlin had constructive notice. To allow these parties to eliminate Pioneer's interest without even providing notice would be utterly unfair. The IRS, on the other hand, took no steps to provide notice to third parties of its claim.